Filed 7/24/26  In re M.Z. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.Z., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. C.Z., Defendant and Appellant. | G066435 (Super. Ct. No. 25DP0863) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Daphne Sykes, Judge. Affirmed. Motions to take additional evidence and to dismiss. Denied.

Mansi Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*            \*            \*

C.Z. (mother) appeals after the juvenile court made jurisdictional findings declaring her eight-year-old son (the minor) a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (c) and (g), ordered him removed from her care, and granted her supervised visitation.[1] Mother contends there is insufficient evidence to support the jurisdictional finding under subdivision (a) of section 300. In addition, she argues the court abused its discretion in requiring that visitation between her and the minor be monitored. We find no error and affirm the challenged order.

## FACTS

In late-July 2025, the minor was taken into protective custody by the Anaheim Police Department after the minor's maternal grandmother (the grandmother) contacted law enforcement about "severe bruising on the [minor's] face, arms and hip area." The grandmother discovered the injuries when mother brought the minor to her to babysit while mother was at work. A social worker approved, and later received emergency placement approval for, the minor to remain in the grandmother's care pending juvenile court proceedings. Mother was arrested for felony child abuse with possible great bodily harm. (Pen. Code, § 273a(a).)

---

[1] All further statutory references are to the Welfare and Institutions Code.

# I.

## DETENTION REPORT

Among other matters, SSA's detention report indicated there was no prior history of SSA involvement regarding the child and mother had no prior criminal history. It also detailed information obtained from the grandmother, mother, and the minor after law enforcement and SSA intervention, as well as the opinion of a child abuse pediatrician.

The grandmother reported that three days before she contacted law enforcement, she went to the beach with mother and the minor. While there, the minor asked mother to buy him "'vampire teeth'" using $50 he had with him. When mother later discovered the minor took the money from the grandmother's purse, mother "hit the [minor] with her hand and with a plastic sword, which broke on the [minor's] body repeatedly." The grandmother noticed the resulting severe bruising the next day when she babysat the minor and the minor "confessed what had happened to him." During a phone call with mother, mother acknowledged having used "excessive discipline" and said "she did not know why she did it." Although fearful of retaliation from family members, the grandmother contacted law enforcement. In the few days she waited for them to respond, she did not let mother take the minor home or be alone with him. The grandmother further reported mother had been seeking mental health services for depression, anger management, and anxiety, and had agreed to meet with a provider to discuss possible treatment on the same morning the grandmother contacted law enforcement.

Regarding the past, the grandmother explained mother had moved out of the grandmother's house about a year prior because the grandmother would interfere when mother would use "corporal discipline" on

the minor and mother did not like the interference with her parenting. The grandmother also recalled an occasion roughly two years prior in which she noticed what appeared to be finger marks on the minor's face; mother tried to cover up the redness with makeup. More generally, the grandmother said "mother appears to have anger issues" as she "easily gets disturbed or angry at people," although the grandmother never thought she would hit the minor in the manner she did.

Mother admitted to harming the minor, blamed him for stealing the money, and conveyed he had taken money without permission twice before. Estimating the incident lasted between three and ten minutes, she said she could not recall how many times she hit the minor and explained that she "blacked out" and "lost herself" because she "was so mad." Mother also conveyed she knew she "'got out of hand'" and "need[ed] help for what [she] did," so she sought counseling and had an upcoming appointment to start sessions. Although mother denied having used excessive discipline in the past, stating it "'never got to this level,'" she admitted to previously using a sandal "to pat the child on his bottom" which did not leave any marks. She also said the minor got a bruise on his face two years prior because they were playing a game, her hand slipped, and she accidentally slapped his face. As for placement, she asked that the minor remain with the grandmother instead of going into foster care and denied knowing the identity of the minor's father.

The minor conveyed "that when he 'does not listen' or 'does something bad' the mother hits him with a belt, a sandal, her hand, and a plastic sword," with the most recent incident being the one that led to the grandmother's report. He initially did not want to speak about things but then agreed to share what took place. He explained he did not tell the

grandmother right away because mother "told him not to say anything." About the specific incident, he conveyed: "'My mom hit me real hard with a plastic sword. I did not count how many times[,] but it was more than once. The sword broke in half when she hit me on my legs and arms. She also slap[ped] me on both sides of my face. I had a lot of bruises and like blood[,] but I only have a little bruise now.'" He showed pictures of the injuries taken by the grandmother the day after they were inflicted. The minor also said mother had hit him before with the plastic sword, a belt, and a sandal, and it hurt and left bruises. After hitting him, mother usually would make him go to bed. From an emotional standpoint, he expressed that what mother did made him sad and he did not feel safe with mother because he was afraid she would hit him again. He wanted to remain living with the grandmother and did not want to return to mother's home.

A child abuse pediatrician reviewed photos of the minor's injuries and said they were consistent with the minor's report of what took place. The doctor expressed concern about the amount of force that must have been used for the bruises to remain a week later. In addition, the doctor was concerned about "additional medical complications from severe ongoing trauma in the mother's home," as well as emotional and psychological trauma.

Based on the overall circumstances, SSA expressed concern about the minor's well being in mother's care, particularly because mother appeared to "lack . . . insight and accountability into her actions that . . . caused serious harm to the [minor's] physical and emotional wellbeing." It recommended two hours of monitored visitation weekly between mother and the minor, with the minor to remain in the grandmother's care.

## II.

## DEPENDENCY PETITION

The same day SSA filed the detention report, it filed a dependency petition. The factual allegations in the petition were consistent with the facts contained in the detention report. The petition alleged the minor fell within the juvenile court's jurisdiction for a variety of reasons. They included: the minor's suffering of, or substantial risk of suffering, serious, nonaccidental physical harm caused by mother (§ 300, subd. (a)); a failure and/or inability of mother to protect the minor (*id.*, subd. (b)(1)); mother's willful or negligent failure to provide the minor with adequate food, clothing, shelter, or medical treatment (*ibid.*); the minor's suffering of, or substantial risk of suffering, serious emotional damage due to mother's conduct (*id.*, subd. (c)); father's inability to provide for, or arrange appropriate care for, the minor due to father's unknown identity and whereabouts (*id.*, subd. (g)).

## III.

## DETENTION HEARING

At the detention hearing, mother denied all allegations in the petition, invoked her constitutional right to remain silent because of the pending criminal case, and requested the minor be returned to her care with protective orders. Alternatively, mother asked for 15 hours of weekly visitation, without specification of whether it would be monitored.

The court ordered the minor to be detained from mother pending future hearings, with reunification services to mother, and authorized SSA to allow the child to remain in the grandmother's care. As to visitation with mother, the court ordered a minimum of two hours monitored visitation,

6

subject to input from the minor and SSA's ability to lift or reinstate the monitoring as it deemed appropriate.

## IV.

### JURISDICTION AND DISPOSITION REPORT

An August 2025 jurisdiction and disposition report detailed SSA's additional interviews with, and observations of, the grandmother, the minor, a maternal aunt, and mother, as well as initial visitation between mother and the minor.

The grandmother reiterated details of the incident that led to SSA involvement and the reason for mother moving out of the grandmother's home. Regarding the latter, she said she could not specifically describe the manner in which mother previously hit the minor because mother would do it behind closed doors, but she said she could hear the child crying and screaming. When the grandmother "tried to kick in the door and threatened to call the cops," mother moved out of the house with the minor.

The minor reiterated that mother used to hit him when he "'was being bad,'" and further conveyed that mother would yell at him to "'shut up'" and "'get out.'" He said he liked when mother was fun and played soccer with him, and understood she was currently "'getting help.'" The minor was still concerned mother would hit him if they reunified and stated he wanted mother to get help.

The maternal aunt expressed her belief that mother was making excuses for what happened and needed help. She thought mother could benefit from anger management and therapy.

Mother relayed her belief "that the [minor] ha[d] always been safe in her care and . . . ha[d] always been fine with her, but [also said that] because of him, she want[ed] to better herself." She indicated she was

7

enrolled in therapy and said she was willing to participate in recommended services so she could reunify with the minor. She believed "the [dependency] case should be closed" and "the criminal charges [should] be dropped."

Initially, the minor did not want to visit with mother but was willing to talk to her over the phone. After the first phone call, the minor agreed to an in-person visit with mother so he could get a costume from her.

SSA indicated mother had made moderate progress toward alleviating or mitigating the causes leading to court involvement. Nevertheless, concerns remained about the minor's safety, so SSA recommended he remain removed from her care, with the provision of reunification services to her. An attached case plan provided for monitored in-person visitation in an unspecified amount, with SSA being authorized to liberalize the frequency, duration, and need for monitoring, or restrict the visitation only if deemed necessary to protect the minor's health and safety.

Five addenda to the jurisdiction and disposition report, filed between September 2025 and January 2026, provided additional information about the minor, the mother's progress, and their interactions.

Early September 2025 visits were appropriate, playful, and engaging, and the minor was reported to not want the visits to end. SSA increased the duration of the monitored visits to six hours weekly, and later that month visitation was adjusted to eight hours weekly, "with [four] hours being supervised and [four] hours being monitored."

By mid-October, the minor expressed wanting to have more visits with mother. However, he said he was not comfortable with unsupervised or overnight visits because he still did not feel safe being alone with her. Later that month, SSA liberalized visitation to allow mother to take the minor to

8

her home during the supervised and monitored visits. Monitors overseeing the visits said they did not observe any issues or concerns during visits.

As of early December, the minor expressed wanting to do an overnight visit at mother's home because he was excited for Santa to visit his house. Although SSA allowed two 12-hour supervised visits for the Christmas holiday, it did not allow an overnight stay or otherwise liberalize mother's general visitation at that time because "there were issues with the child being uncomfortable" and the minor had been reporting mother "was saying inappropriate things."

In early January 2026, SSA inquired of mother's various service and therapy providers, as well as the minor's school counselor. Mother had completed an anger management class and parenting classes. Regarding the former, it was conveyed mother "always had good participation, attitude, and behavior in class." Regarding the latter, SSA was informed "the instructors 'don't take notes on individuals in the classes.'" Mother's therapist said mother was "'doing pretty well'" and said she had no concerns about mother. In addition to making progress and setting boundaries, mother had learned to use coping skills to better regulate her emotions and "'how to manage anger.'" While the therapist would not answer whether she believed it appropriate for the minor to be returned to mother's care, she conveyed she "'support[ed] the [minor] being in the mother's care'" "'[a]s long as safety [was] in place.'" The minor's school counselor denied having urgent concerns about the minor and said during their weekly check-ins the minor "'sticks to school stuff.'"

## V.

### JURISDICTION AND DISPOSITION HEARING AND ORDER

At the January 2026 jurisdiction and disposition hearing, the juvenile court received testimony from the social worker involved in the case and heard from all parties.

The social worker testified she spoke with the minor's counsel on the afternoon after she submitted the last addendum to the jurisdiction and disposition report. The therapist conveyed some concerns, indicating the minor was not willing to talk about mother and was exhibiting aggressive behavior which the therapist believed was a result of the July 2025 incident. Based on the overall circumstances, the social worker conveyed SSA's recommendation remained placement with the grandmother, with family reunification services to mother. Regarding visitation, SSA had just increased visitation to 16 hours per week and made it all supervised instead of monitored.

After hearing argument from the parties, which focused on whether the minor should be returned to mother's care, the juvenile court found SSA met its burden of demonstrating the minor fell within the scope of the court's jurisdiction. It sustained all the allegations in the petition, finding they were proven by a preponderance of the evidence. Based on the sustained allegations, it found jurisdiction under section 300, subdivisions (a), (b)(1), (c), and (g). The court declared the minor a dependent, ordered him removed from mother's custody vesting SSA with the ability to determine placement, and ordered reunification services for mother. It also adopted SSA's visitation recommendation contained in case plan attached to the August 2025 disposition report—monitored in-person visitation in an unspecified amount, with SSA being authorized to liberalize the frequency, duration, and need for

monitoring, or restrict the visitation only if deemed necessary to protect the minor's health and safety.

Mother timely appealed from the jurisdiction and disposition order.

DISCUSSION

Mother's challenge on appeal is limited. She contends the juvenile court's assumption of jurisdiction pursuant to subdivision (a) of section 300 is not supported by substantial evidence. In addition, she argues the court abused its discretion by failing to order unsupervised visitation at the disposition stage. We find no error in either respect.

I.

JURISDICTIONAL FINDING UNDER SECTION 300, SUBDIVISION (A)

Mother argues there was no basis for jurisdiction under subdivision (a) of section 300 because there was (1) no evidence she caused "great bodily injury" to the minor and (2) no evidence of a substantial risk of serious physical harm to the minor at the time of the jurisdiction hearing.

*A. Applicable Law and Standard of Review*

The opening clause of section 300 provides: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court." The subdivisions that follow describe children who may be adjudged dependents of the court.

Subdivision (a) of section 300 concerns children who have suffered, or are at a substantial risk of suffering, serious physical harm caused nonaccidentally by the child's parent or guardian. As expressly stated in the statute, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a

11

history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (*Ibid.*)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection. [Citations.] A parent's "'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.] 'To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur."'" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.)

In the juvenile court, SSA bears the burden of proving by a preponderance of the evidence that a child is a person described by section 300. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773.) On appeal, we review the juvenile court's jurisdictional findings for substantial evidence. (*I.J.,* at p. 773.) That is, we look to whether there is contradicted or uncontradicted evidence that is reasonable, credible, and of solid value supporting the court's findings. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the [juvenile] court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." [Citation.] "We do not reweigh the evidence or exercise independent judgment."'" (*I.J.,* at p. 773.)

Although one valid jurisdictional finding is enough to declare a child a dependent (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*)), we may exercise our discretion to review any challenged finding if, for example, the finding "'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' . . . "'could have other consequences for [the appellant], beyond jurisdiction,'"'" or is "based on particularly pernicious or stigmatizing conduct" (*id.* at pp. 285–286).

*B. Analysis*

The evidence of nonaccidental infliction of serious physical harm on minor by mother is abundant. The undisputed evidence shows mother hit the minor multiple times, with a plastic sword and her hand, during the incident that led to SSA involvement. In addition to the minor's explanation of what occurred, which was consistent with the grandmother's description of what he had told her, mother admitted to hitting the minor and acknowledged she "'got out of hand.'" She estimated the incident lasted three to ten minutes, and she explained that she "blacked out" and "lost herself" because she "was so mad." Photos taken by the grandmother depicted linear red marks and large, dark colored bruises on various parts of the minor's body, including his face. At least one of the bruises was still visible and four inches wide one week after the incident. Contrary to mother's insinuations, a child does not have to sustain fractures or internal injuries, or suffer lasting physical impairment, to be considered to have sustained serious physical harm for purposes of dependency jurisdiction. (See, e.g., *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438 [deep purple bruises left after child struck with belt]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1645 [bruises, linear red marks, welts, and broken skin due to being hit with belt and electrical

cord]; *In re A.E.* (2008) 168 Cal.App.4th 1, 3 [black and blue bruises due to being hit with hard objects].)

Mother's reliance on *In re Isabella F.* (2014) 226 Cal.App.4th 128, is unavailing. There, a child suffered fingernail scratches to her face and earlobe, as well as a small cut on her cheekbone, which were all inflicted by mother when trying to control the child during a tantrum. (*Id*. at p. 132.) The appellate court reversed the trial court's finding of jurisdiction under section 300, subdivision (a), concluding there was insufficient evidence of serious physical harm. (*Isabella F.*, at pp. 138–139.) In addition to describing the injuries as less than serious, the court explained the evidence showed the incident was an isolated one, with no evidence of any other instances of abuse. (*Id*. at p. 139.)

There was also sufficient evidence demonstrating a substantial risk of future nonaccidental serious physical harm to the minor. Although mother characterizes the circumstances as arising from a "single incident of excessive physical discipline," the minor and the grandmother each said the incident triggering SSA involvement was not the first time mother hit the minor. The minor conveyed mother would him with a belt, a sandal, her hand, or a plastic sword when he would not listen or would do something wrong. According to him, the July 2025 incident was the worst, but he sustained bruises on prior occasions as well. The grandmother confirmed the prior physical abuse, explaining it took place behind closed doors, she could hear the minor scream and cry, and she observed what appeared to be finger marks on the minor's face afterward. She tried to intervene with mother's parenting and discipline of the minor, but doing so led mother to move out of the house with the minor.

14

Mother argues the record evidences she completed all required services—parenting education, anger management, and individual therapy—and sought out services beyond those required by SSA, resulting in demonstrated insight into her conduct and improved coping skills and parenting techniques. As SSA recognizes, "mother took meaningful steps toward recovery" and she "should be recognized for [her] progress." Notwithstanding that progress, the overall circumstances, which also included mother's consistent denials of any prior physical abuse and the minor's continued unwillingness to discuss mother and her behavior during therapy sessions, were enough for the juvenile court to conclude there still existed a substantial risk of future nonaccidental serious physical harm at the time of the jurisdiction hearing. (See § 300, subd. (a) [court may find substantial risk of serious future injury based on manner in which less serious injury was inflicted, history of repeated inflictions of injuries, or combination of both and other actions by parent].)

## II.

### DISPOSITION ORDER

Mother does not challenge removal of the minor from her care, instead limiting her disposition related argument to the juvenile court's decision to require that visitation be monitored, subject to SSA's discretion to liberalize it. She argues the court abused its discretion in that regard because there was "uncontroverted evidence that [her] visits [with the minor] were consistently long, positive, appropriate, and free of any safety concerns." We disagree.[2]

---

[2] SSA filed a motion to dismiss this portion of the appeal as moot, along with a motion requesting we take additional evidence, pursuant to Code of Civil Procedure section 909, consisting of a May 2026 informational

During reunification efforts, visitation generally must be "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) "Well-being" in this context includes both emotional and physical health. (See *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1102; *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.)

Here, although there was evidence mother was making significant progress and supervised visits between her and the minor were positive, there was also evidence from which the juvenile court could have concluded unsupervised visits were not yet in the minor's best interests. Beyond physical impacts, the minor was emotionally impacted by mother's physical aggression. At the outset of SSA's involvement, he expressed mother's actions made him sad, he did not feel safe in her care, and he was scared she would hit him again if left alone with her. Although his feelings seem to have changed somewhat with time, there was evidence the emotional impact remained at the time of the disposition hearing. The minor's therapist conveyed the minor was uncomfortable talking about mother and the incident that led to his removal from her care, and he would "quickly change the subject" if mother was brought up. He was also exhibiting aggression toward others and low self-esteem, which the therapist said was "'a result of what he

ex parte SSA filed with the juvenile court. The ex parte document indicates SSA liberalized mother's visitation in February 2026 to 16 hours of unsupervised visitation, allowed some overnight visits in March and April 2026, and thereafter transitioned to a 60-day trial visit. We deny both of SSA's motions. Even if we assume arguendo SSA modified visitation as described in the ex parte document, we would consider mother's challenge to the disposition order. In addition to authorizing SSA to liberalize visitation, the order allows SSA to restrict visitation as necessary to protect the minor's health and safety. The ongoing possibility of monitored or supervised visitation justifies our review.

ha[d] been through with [mother]'" and a "'reaction to severe stress.'" In addition to the supported finding of a significant risk of future serious physical harm, these emotional related circumstances could reasonably support a conclusion that the minor's well-being would best be served through continued monitored visitation until SSA felt visitation could be further liberalized. That the evidence before the court could have allowed it to come to the opposite conclusion does not mean the court abused its discretion by exercising its discretion in the manner it did.

## DISPOSITION

The order is affirmed.

DELANEY, ACTING P. J.

WE CONCUR:

SCOTT, J.

SERVINO, J.

17